```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
DANIEL K. SILVERSTEIN, Derivatively     :
on Behalf of TETRAGON FINANCIAL GROUP   :
LTD.,                                   :
                                        :
          -v-                           :      11 Civ. 4776 (JSR)
                                        :
BYRON KNIEF, RUPERT DOREY, DAVID        :      MEMORANDUM ORDER
JEFFREYS, LEE OLESKY, GREVILLE V.B.     :
WARD, PATRICK DEAR, READE GRIFFITH,     :
ALEXANDER JACKSON, JEFF HERLYN,         :
MICHAEL ROSENBERG, DAVID WISHNOW,       :
TETRAGON FINANCIAL MANAGEMENT LP,       :
and POLYGON INVESTMENT PARTNERS LLP,    :
                                        :
          Defendants,                   :
                                        :
          and                           :
                                        :
TETRAGON FINANCIAL GROUP LTD., a        :
Guernsey corporation,                   :
          Nominal Defendant.            :
                                        :
----------------------------------------x
```



JED S. RAKOFF, U.S.D.J.

Plaintiff Daniel Silverstein brings this putative derivative action on behalf of Tetragon Financial Group Ltd. ("TFG" or the "Fund") against TFG's principals and directors, its investment manager, Tetragon Financial Management LP ("TFM" or the "Investment Manager") and Polygon Investment Partners LLP. The suit concerns $205 million in performance fees awarded to the Investment Manager. Plaintiff alleges that these fees were fraudulently awarded because they resulted from defendants' manipulation of the Net Asset Value ("NAV") of the Fund.

1

The various defendants (fourteen in all) have filed five separate motions to dismiss. Although those motions contain multiple issues, the Court finds that it is unnecessary to reach all but one issue, because the one issue is dispositive. Specifically, the plaintiff has not complied with Federal Rule of Civil Procedure 23.1, and therefore the suit must be dismissed.

The pertinent allegations, taken primarily from the Derivative Complaint ("Compl.") and from documents expressly referenced in that Complaint, are as follows:

Plaintiff is a resident of Pennsylvania and has been a TFG shareholder since March 2010. Compl. ¶ 15. Plaintiff alleges that the defendants manipulated the NAV below its fair value so that they could thereafter obtain performance fees when they subsequently raised the NAV. Id. ¶ 45. Under the Investment Management Agreement ("IMA") between TFG and the Investment Manager, the Investment Manager is awarded a performance fee of 25% for increases in the NAV of the fund. Id. ¶ 8.[1] The IMA does not contain a fixed high-water mark; such a high-water mark would prevent the Investment Manager from receiving fees until the Fund had surpassed its previous high-water mark. Between the fourth quarter of 2009 and

---

[1] The 25% fee is calculated on any increase in the Reference NAV -- the greater of the NAV from the previous two quarters -- after adding a "Hurdle" of approximately LIBOR + 2.6%. Compl ¶ 8. The Investment Manager is also paid 1.5% per annum of the total NAV of the fund. Id.

the first quarter of 2011, the Investment Manager received almost $205 million in fees. Id. ¶ 57. These fees were paid out even though the NAV in the fourth quarter of 2010 was $211 million less than the NAV in the third quarter of 2008. Id.

Plaintiff alleges that defendants wrote down the NAV "by manipulating downward the underlying assumptions in TFG's mark-to-model method (used for valuing equity tranches of a CLO)." Id. ¶ 46. Plaintiff acknowledges, however, that defendants' 2008 Annual Report noted the "dramatic global economic decline and increasingly negative outlook as well as extensive upheaval in the global financial markets." Id. Defendants assert that it was because of this downturn that they changed the assumptions in their model. Id.

TFG also created an Accelerated Loss Reserve ("ALR"), which resulted in a further mark down of the NAV. TFG added $431 million to the ALR in 2008 and 2009. Id. ¶ 48. Putting these funds into the ALR reduced the NAV by approximately thirty percent. Id. Plaintiff alleges that the ALR is "an accounting manipulation created for the purpose of generating additional performance fees." Id. ¶ 55.

In the third quarter 2009, TFG increased the ALR by $79.7 million, even though it said that that quarter had brought "a return to profitability." Id. ¶ 58. Moreover, in the 2009 Annual Report, TFG stated that "the second half of 2009 saw a general recovery in many of TFG's CLO investments, which resulted in an increase in fair

3

values." Id. ¶ 60. Nonetheless, in the fourth quarter of 2009, TFG again increased the ALR by $15.2 million. Id.

In 2010 and 2011, TFG reversed $193 million from the ALR and the Investment Manager received $48.3 million in performance fees from the resultant increase in the NAV. Id. As of the date the Complaint was filed, the ALR still contained $155.7 million; if those funds are removed from the ALR in the future, they will net another $38.9 million in fees for the Investment Manager. Id.

Plaintiff asserts that the manipulations of the ALR and the NAV have negatively impacted TFG's market share, with TFG trading at a 30% discount to its NAV per share at the end of the first quarter 2011. Id. ¶28. Plaintiff also points to the low dividend offered on TFG stock: in 2010, the dividend paid to shareholders was $34.2 million while the management and performance fees equaled $133.5 million. Id. ¶ 63.

Based on the aforementioned allegations, plaintiff asserts four claims against the defendants: 1) breach of fiduciary duties; 2) unjust enrichment; 3) constructive fraud; and 4) violation of the Investment Advisors Act of 1940.[2]

Defendants move to dismiss the complaint on several grounds, the first of which is that the plaintiff failed to comply with Federal Rule of Civil Procedure 23.1(b)(1). That Rule requires that

---

[2] The first three claims are brought against all defendants; the fourth claim is brought only against Defendants Dear, Griffith, Herlyn, Jackson, Rosenberg, Wishnow and the Investment Manager. Compl. ¶¶ 79-101.

4

a plaintiff in a derivate suit "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." Fed R. Civ. P. 23.1(b)(1). If plaintiff is required to comply with this rule and failed to do so, this action cannot proceed. Therefore, the first question is whether Rule 23.1(b)(1) applies to this suit.

Plaintiff asks the Court to declare that the rule is substantive and thus does not apply in this diversity suit. The defendants argue, however, that Rule 23.1(b)(1) is a procedural pleading requirement. Plaintiff responds that the Rule is akin to a standing requirement.

This Court has previously noted in dicta that Rule 23.1(b)(1) deals with the pleading requirements for what a plaintiff must allege in his complaint and does not set forth standing requirements. In re Merrill Lynch & Co. Sec., Derivative & ERISA Litig., 597 F. Supp. 2d 427, 430 (S.D.N.Y. 2009). On at least one occasion however, the Second Circuit has characterized the rule as akin to a standing requirement. In re Bank of New York Derivative Litig., 320 F.3d 291, 298 (2d Cir. 2003). But, as this Court noted in Merrill Lynch, standing "does not fit neatly into one or the other divisions of the substance/procedure dichotomy of Erie." 597 F. Supp. 2d at 431.

Standing is not so easily classified in part because standing requirements may be characterized differently depending on the context. In Merrill Lynch, for example, the Court characterized the standing issue that was involved there -- which was not the issue relating to Rule 23.1, but rather a dispute over whether "federal common law" or Delaware law should apply to the case -- as "akin to a substantive policy determination," even though the Rule 23.1(b)(1) issue was procedural. Id. Of particular relevance here, standing in the context of derivative suits is different from standing in many other contexts, because the plaintiff in a derivative suit is bringing suit on behalf of the corporation. If the Rule prohibits this plaintiff from bringing suit but allows another shareholder who *was* a contemporaneous owner to bring suit in a federal forum, the recovery in the latter suit will still run to the corporation as it would have in the first suit. See 7C Wright & Miller, et al. Federal Practice and Procedure § 1829 (3d ed.).

Nonetheless, if the Court were reviewing this issue de novo without the Federal Rules, the Court might well find that the continuous ownership rule was substantive. But, this case is not a straightforward Erie question like the question this Court faced in Merrill Lynch.[3] As the Supreme Court reiterated recently, if a Federal Rule of Civil Procedure applies to a case, courts "do not

---

[3] The Court notes, although it need not address this issue further, that the Fund here is organized in a foreign jurisdiction, so the traditional federalism concerns of Erie are not present here.

6

wade into Erie's murky waters unless the federal rule is inapplicable or invalid." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 130 S. Ct. 1431, 1437 (2010).[4]

In fact:

> When a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the typical, relatively unguided Erie Choice: the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

Hanna v. Plumer, 380 U.S. 460, 471 (1965).

In the Rules Enabling Act, Congress authorized the Supreme Court to promulgate rules of procedure subject to review by Congress, 28 U.S.C. § 2072(a), but with the limitation that those rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). In determining whether the Rule is valid under the Rules Enabling Act, a plurality of the Supreme Court concluded last year that the Rule must "really regulat[e] procedure, - the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." Shady Grove, 130 S. Ct. at 1442 (quoting Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941)). The plurality concluded that courts should not look to "whether the rule

---

[4] Justice Stevens provided the fifth vote for this part of the Court's opinion, but he did not join the portions discussed below. Therefore, as noted below, those parts of the opinion were joined by only a plurality of the Court.

affects a litigant's substantive rights" because "most procedural rules do." Id. at 1442. Instead, the plurality found that "[w]hat matters is what the rule itself regulates: If it governs only 'the manner and the means' by which the litigants' rights are 'enforced,' it is valid; if it alters 'the rules of decision by which [the] court will adjudicate [those] rights,' it is not." Id. at 1442 (quoting Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 446 (1946)).

Put another way, "Congress has the power to enact federal rules even if they fall[] within the uncertain area between substance and procedure, [as long as they] are *rationally capable* of classification as either." Hanna, 380 U.S. at 472 (emphasis added). Since Rule 23.1(b)(1) is rationally capable of classification as either substantive or procedural, the Court cannot conclude that Congress lacked the power to promulgate it. Moreover, other courts have held that Rule 23.1(b)(1) or its predecessor was procedural. See, e.g., Quinn v. Anvil Corp., 620 F.3d 1005, 1013 n.5 (9th Cir. 2010); Bankers Nat'l Corp. v. Barr, 7 F.R.D. 305, 307 (S.D.N.Y. 1945). In fact, according to Wright and Miller, "[t]he contemporaneous ownership requirement generally has been given effect by the federal courts in the face of inconsistent state law." 7C Wright & Miller, et al. Federal Practice and Procedure § 1829 (3d ed.). The Supreme Court has previously stated that Rule 23.1(b)(1) "neither create[s] nor exempt[s] from liabilities." Cohen v.

8

Beneficial Indus. Loan Corp., 537 U.S. 541, 556 (1949). Moreover, the Supreme Court has rejected every statutory challenge to a Federal Rule that has come before it, see Shady Grove, 130 S. Ct. at 1442 (2010), and it appears that every federal court has followed suit. See Lucas Watkins, How States Can Protect Their Policies in Federal Class Actions, 32 Campbell L. Rev. 285, 296 (2010). The Court concludes that Rule 23.1(b)(1) does apply to this case.

Having so concluded, the next question is whether the plaintiff complied with the Rule. As Judge Sand has explained, the contemporaneous ownership requirement serves dual purposes: to "prevent potential derivative plaintiffs from buying a lawsuit by purchasing stock" and to "insure [sic] that derivative actions are brought by shareholders who have actually suffered injury and have an interest in the outcome of the case." Ensign Corp. S.A. v. Interlogic Trace, Inc., No. 90 Civ. 3497, 1990 WL 213085, at *2 (S.D.N.Y. Dec. 19, 1990) (internal quotation marks omitted). Further to these purposes the Second Circuit, while rejecting the continuing wrong doctrine adopted by some other courts, has held that, in order to comply with Rule 23.1(b)(1), derivative plaintiffs must "have owned stock in the corporation *throughout* the course of activities that constitute the *primary basis* of the complaint." Bank of New York, 320 F.3d at 298 (emphases in original).

The gravamen of the Complaint is that the IMA did not have a high-water mark and that the defendants manipulated the NAV lower in

9

order to earn performance fees when they raised the NAV back to appropriate levels. The Investment Management Agreement was signed in 2007, but plaintiff asserts that his claim is not based on the terms of the IMA. Even if that were true, the plaintiff would not have owned stock throughout the period of core conduct that constituted the primary basis of the complaint because the core conduct of the downward manipulation of the NAV commenced in 2008 and ended in 2009. After plaintiff bought stock, there were no further downward manipulations of the NAV.

Moreover, in his brief, in responding to a statute of limitations argument, the plaintiff asserts that a "reasonably diligent plaintiff could not have discovered the facts constituting the violation of the [Investment Advisers Act] until March 2010, when TFG issued its 2009 financial statement." Plaintiff's Omnibus Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 27. Of course, if a reasonably diligent plaintiff could have discovered the facts constituting the violation in March 2010 because of material released about activity that occurred in 2009, then the core of the conduct comprising the violation must have occurred before March 2010. As discussed above, the plaintiff did not purchase his stock until March 2010.[5] Even if

---

[5] Moreover, on February 16, 2010, a Wall St. Journal article, quoted by the plaintiff in the Complaint, described the performance fees as follows: "It might be one of the greatest financial performances of 2010 - a fortune created even after losing staggering sums for investors. Meet the managers of Tetragon Financial Group. They are

10

some conduct that was the basis of the complaint continued to occur after the plaintiff bought his stock, it is clear that he did not own stock *throughout* the course of activities that constitute the *primary basis* of the complaint.[6]

Plaintiff notes in the alternative that the Court could find that the conduct here was not part of a "continuous transaction," but rather a series of discrete transactions. Pl. Mem. at 8. It is telling that the plaintiff does not provide any support for that argument. If the transactions were discrete, Silverstein could "assert standing over those transactions for which the core conduct occurred after the plaintiff acquired stock in the company." Bank

---

five Wall Street veterans who, by luck and design, enjoy what Tetragon investor Charles W. Griege Jr. critiqued as 'the most flawed compensation system' he had ever seen . . . And Tetragon is pocketing one-quarter of the 'gains' it registers each quarter, though it is really just earning back the $767 million in losses recognized over the past year, according to securities filings." Compl. ¶ 7

[6] The plaintiff seizes on a vague line in a footnote of the Bank of New York opinion which states that the plaintiff must own stock "before all of the core conduct occurred." Bank of New York, 320 F.3d at 298 n.4. Plaintiff asserts that he was therefore required only to own stock before the *end of all* of the core conduct, rather than before the commencement of the core conduct. In other words, if plaintiff purchased the stock on the last day of the core conduct, he asserts that he would have owned stock before all of the core conduct occurred. But as discussed above, the Second Circuit repeated several times in the text that the test is whether plaintiff owned stock throughout the course of core conduct. To make certain its rule was clear, the court emphasized the word "*throughout*" in the opinion. Id. at 298. Plaintiff's interpretation is not a plausible reading of Bank of New York.

of New York, 320 F.3d at 298 n.4. The conduct here was a continuous transaction where the defendants allegedly manipulated the NAV lower and then reaped the profits when they readjusted the NAV to proper levels. Plaintiff's alternate argument, which must be premised on an argument that each increase of the NAV was a discrete transaction, completely contradicts his theory of the case. Plaintiff's claims are premised on the allegation that the conduct was part of a continuous transaction where the NAV was manipulated lower *so that* TFM could later mark it up and obtain the fees. He does not independently object to the marking up of the NAV to proper levels. Accordingly, this was a continuous transaction, and as discussed above, plaintiff did not own stock throughout the course of the transaction which constitutes the primary basis of his Complaint. He has therefore failed to comply with the contemporaneous ownership rule of Rule 23.1(b)(1).

Therefore, the defendants' motions to dismiss are granted and the Complaint is dismissed in its entirety with prejudice. Clerk to enter judgment.

SO ORDERED.

Dated: New York, NY
February 14, 2012

_____
JED S. RAKOFF, U.S.D.J.